IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SASWATI N. CHAND, | : | |
|     *Plaintiff*, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MERCK & CO., INC., | : | No. 19-0286 |
|     *Defendant.* | : | |

## **MEMORANDUM**

PRATTER, J.                                                                                                                                                                                                                                                                           JULY 26, 2019

      Dr. Saswati Chand received a conditional offer of employment at Merck & Co., Inc. The offer was contingent upon, among other things, Dr. Chand's completion of paperwork regarding her immigration status and eligibility for work in the United States. Although Dr. Chand had previously told her Merck interviewers that she held a temporary work visa (effective until 2020), when Dr. Chand submitted her immigration paperwork, Merck rescinded its employment offer because Dr. Chand would eventually require sponsorship.

      Dr. Chand initially filed a complaint premised on theories of promissory estoppel, negligent misrepresentation, and breach of the implied covenant of good faith and fair dealing (the "original Complaint"). After Merck moved to dismiss all three claims and the Court held oral argument on the motion, Dr. Chand sought leave to amend her complaint (the "Amended Complaint"). Merck maintains that dismissal is proper because Dr. Chand's proposed amendments are futile.

      The Court grants Dr. Chand's motion for leave to amend the negligent misrepresentation claim. As for all of Dr. Chand's other claims, they are dismissed and leave to amend is denied with prejudice.

## BACKGROUND[1]

Dr. Chand applied for a Philadelphia-based Global Medical Information Scientist position with Merck in late 2017. While her application was pending, Dr. Chand accepted a different position in San Diego, California with Crown Bioscience.

Dr. Chand interviewed with several Merck employees in early 2018. During that interview, Dr. Chand—a foreign citizen who came to the United States for graduate school in 2011[2]—told Heather Sutcliffe, a Merck recruiter, that she did not require sponsorship because she had a 2.5-year work visa (lasting until May 2020)[3] and because "she had a long-term boyfriend and they had plans of settling down in the near future." Amended Compl. ¶ 12. Dr. Chand also met with an operations team of Merck medical professionals. As a result of that meeting, "[e]ach member of the Merck operations team that interviewed Dr. Chand knew she was on an F-1 student visa and had moved to the United States for her post graduate degree." *Id.* ¶ 15.

Before Merck made a hiring decision, Dr. Chand moved to San Diego to begin working for Crown Bioscience. About a month after Dr. Chand started working at Crown Bioscience, Ms. Sutcliffe contacted Dr. Chand on behalf of Merck to informally offer Dr. Chand a position with the company; Merck also told Dr. Chand that she would receive a formal "offer letter" soon. *Id.* ¶ 18. The subsequent offer letter (attached to Dr. Chand's original Complaint and Amended Complaint) includes the following statements (among others):

- "Your employment with Merck is 'at will'. This means that just as you are free to leave the Company at any time, the Company retains the same right to terminate your employment at any time, with or without cause and with or without notice. Nothing herein

---

[1]  The Court accepts as true all facts as alleged in the Amended Complaint.

[2]  Dr. Chand attended Thomas Jefferson University in the Biochemistry and Molecular Pharmacology program. After she completed that program, she worked in the Thomas Jefferson Department of Surgery with a focus on pancreatic cancer.

[3]  Dr. Chand's visa included a STEM Optional Practical Training extension.

2

> shall be construed as creating a contractual relationship between you and Merck."

- "This offer is contingent upon your successful completion of a pre-placement drug screen, satisfactory verification of your employment history, education, criminal history and background check results. We advise you not to alter your current employment status until we advise you that the above contingencies have been successfully completed."

- "This offer is contingent upon proof of your identity and eligibility to work in the United States, as required by the Immigration Reform and Control Act of 1986. This includes completion of the I-9 form and production of the required documentation."

Amended Compl., Ex. 2 (Offer Letter).

After receiving the offer letter—but before Merck finalized her onboarding—Dr. Chand resigned from her position with Crown Bioscience. A week later, Dr. Chand and her significant other paid a $10,000 deposit on a townhouse in Manayunk.

Soon thereafter, Merck contacted Dr. Chand to rescind the offer of employment. In a letter emailed to Dr. Chand, Merck stated its decision was "based on information [Dr. Chand] disclosed regarding [her] visa status[.]" Amended Compl., Ex. 3 (Rescission Letter). In subsequent communications between Dr. Chand and Merck, Merck stated that "because Dr. Chand answered 'no' to the [onboarding] question of 'will you now or in the future require sponsorship for employment visa status?', Merck could not hire [Dr. Chand] because a person working on a F-1 student visa would require sponsorship once the visa expired." Amended Compl. ¶ 36 (punctuation in original).

Dr. Chand eventually secured alternative employment at Thomas Jefferson University as a Post Doc Fellow. Dr. Chand's salary at the University is about half of what her salary would have been at Merck (not counting bonuses and/or incentives she may have been entitled to).

3

## LEGAL STANDARD

Here, the at-issue motions include Merck's Rule 12(b)(6) motion to dismiss for failure to state a claim and Dr. Chand's motion for leave to amend the complaint, which Merck opposes as futile. The legal standards applied to both motions are the same: "In assessing 'futility,' the district court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." *In re Burlington Coat Factory Litigation,* 114 F.3d 1410, 1434 (3d Cir. 1997) (citations omitted).

Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). To survive a Rule 12(b)(6) motion, therefore, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The question is not whether the plaintiff "will ultimately prevail . . . but whether [the] complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) (citation and quotation omitted). Thus, assessing the sufficiency of a complaint is "a context-dependent exercise" because "[s]ome claims require more factual explication than others to state a plausible claim for relief." *W. Pa. Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) (citations omitted).

In evaluating the sufficiency of a complaint, the Court adheres to certain accepted benchmarks. For one, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994)

(citation omitted); *see also Twombly*, 550 U.S. at 555 (stating that courts must "assum[e] that all the allegations in the complaint are true (even if doubtful in fact)"). The Court must accept as true all reasonable inferences emanating from the allegations and view those facts and inferences in the light most favorable to the nonmoving party. *Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir. 1989).

That admonition does not demand that the Court ignore or discount reality. The Court "need not accept as true unsupported conclusions and unwarranted inferences," *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183–84 (3d Cir. 2000) (citations and quotation omitted), and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citation omitted). If a claim "is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008) (citation omitted).

## DISCUSSION

Dr. Chand's original Complaint included three claims: (1) promissory estoppel, (2) negligent misrepresentation, and (3) breach of the covenant of good faith and fair dealing. Dr. Chand's proposed Amended Complaint includes revised promissory estoppel and negligent misrepresentation claims, drops the standalone claim for the breach of the covenant of good faith and fair dealing, and adds two entirely new claims for breach of implied contract. The breach of implied contract claims in the Amended Complaint are for (1) breach of employment contract and (2) breach of contract premised on the covenant of good faith and fair dealing. First, the Court addresses the promissory estoppel claims, holding that promissory estoppel is not available to Dr.

5

Chand as a matter of law. Second, the Court addresses the negligent misrepresentation claims, holding that an exception to the economic loss rule applies and Dr. Chand is entitled to amend this claim. Third, the Court addresses the two proposed amended claims premised on the breach of an implied contract, holding that both fail as a matter of law.

### 1. Dr. Chand's Promissory Estoppel Claim

A plaintiff states a claim for promissory estoppel where she alleges that: "(1) the promisor made a promise that [it] should have reasonably expected would induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise." *Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 717–18 (Pa. Super. Ct. 2005) (citations omitted). Merck argues that Dr. Chand cannot state a claim for promissory estoppel for two reasons: first, promissory estoppel does not apply in the context of at-will employment, and second, Merck did not make an actionable promise. The Court agrees with Merck in each instance.

#### A. Whether Promissory Estoppel Applies to At-Will Employment Offers

Under Pennsylvania law, at-will employees cannot bring an action for promissory estoppel.[4] According to Merck, it therefore follows that ***prospective*** at-will employees, like Dr. Chand, likewise cannot state a claim for promissory estoppel. Dr. Chand's case is analogous to *Woods v. Era Med LLC*, 677 F. Supp. 2d 806 (E.D. Pa. 2010), in which the Court held that a prospective employee could not bring a promissory estoppel claim. In *Woods*, the plaintiff, Roger Woods, was offered a multi-year position as a helicopter pilot but the employer rescinded its

---

[4] *See Holewinski v. Children's Hosp. of Pittsburgh,* 649 A.2d 712, 714 (Pa. Super. 1994) ("In Pennsylvania, as a general rule, no common law cause of action exists against an employer for termination of an at-will employment relationship."); *see also Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 646 (E.D. Pa. 2004) ("It is firmly established that Pennsylvania courts do not recognize a cause of action for promissory estoppel in the context of at-will employment.").

6

employment offer before Mr. Woods began working. *Id.* at 808. The Court held that Mr. Woods' promissory estoppel claim failed as a matter of law, because (1) a future at-will employment relationship was implied by the parties' negotiations, and (2) "Pennsylvania does not recognize a cause of action for promissory estoppel as an exception to the doctrine of at-will employment." *Id.* at 822. Although the Court did not explicitly discuss the fact that the employment relationship had not actually begun (or that the at-issue promise was an employment offer rather than the promise of continued employment), it held that Mr. Woods could not state a claim for promissory estoppel in any at-will context. *Id.*

Dr. Chand's case is an even more appropriate candidate for application of the rule precluding promissory estoppel claims in the context of at-will employment relationships. Unlike in *Woods*, there is no question here whether the proposed term of employment was at-will. The at-issue offer letter explicitly said the offer was for at-will employment. *See* original Compl., Ex. 1; Amended Compl., Ex. 1 ("Your employment with Merck is 'at will[.]'"). Allowing a cause of action for promissory estoppel for reliance on employment ***offers*** but not for reliance on ***continued*** employment itself would lead to untenable consequences. At bottom, it would mean that Merck could have terminated Dr. Chand's employment the second she became an employee, but could not rescind its offer of employment up until that point. Such a rule would make no sense and plainly demonstrates why promissory estoppel is not available to Dr. Chand here, just as it would not have been available to Dr. Chand if she had started working for Merck as an at-will employee.

Dr. Chand does not address the long line of cases excluding at-will employment from the reach of promissory estoppel claims. *See supra* n.4. Instead, Dr. Chand appears to argue that the at-issue contract was not terminable at-will pursuant to the Restatement of Employment Law. Section 2.02 of the Restatement says: "The employment relationship is not terminable at will by

7

an employer if . . . (b) a promise by the employer to limit termination of employment reasonably induces detrimental reliance by the employee." Comment A clarifies that the Section "lists the principal contractual variations from at-will employment" and Comment C adds that "Section 2.02(b) makes clear that promises by employers that reasonably induce detrimental reliance by employees, or individuals about to become employees, are enforceable in accordance with the well-established doctrine of promissory estoppel[.]"

In actuality, § 2.02 is inapposite. The offer letter here was explicitly for at-will employment. Dr. Chand cites no case law applying the Restatement section, let alone case law showing that the Restatement somehow preempts language explicitly making an employment relationship at-will. Nor could she. Where an offer letter "explicitly state[d] that the employment relationship would be at-will," the employment relationship is, unsurprisingly, at-will. *Sant v. Branding Brand, Inc.*, No. 672 WDA 2015, 2016 WL 5377939, at *3 (Pa. Super. Ct. Aug. 16, 2016) (refusing to apply "additional consideration" exception to at-will employment presumption because offer letter was explicit that relationship was at-will); *see also Beyda v. USAir, Inc.*, 697 F. Supp. 1394, 1396 (W.D. Pa. 1988) (same). Promissory estoppel does not establish a cause of action for at-will employees under Pennsylvania law, and the same must be true for prospective at-will employees.

### B. Whether the Offer Letter Was a Promise for Promissory Estoppel Purposes

Merck also argues that even if promissory estoppel doctrine applies in the context of at-will employment offers, the offer letter here was not an actionable promise. Courts have generally held that "broad and vague implied promise[s]" do not satisfy the promise requirement. *Universal A. Sys., Inc. v. Honeywell Intl., Inc.*, No. 17-4660, 2018 WL 1757727, at *6 (E.D. Pa. Apr. 12, 2018) (dismissing promissory estoppel claim based on alleged promise to enter into a future

8

contract because it was too indefinite and vague) (citing *C&K Petroleum Products, Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir. 1988)); *see also Bull Int'l, Inc. v. MTD Consumer Grp., Inc.*, 654 F. App'x 80, 100 (3d Cir. 2016) (affirming dismissal of promissory estoppel claim on a motion to dismiss based on an "implied promise" to "continue to do business indefinitely"). The Court has also refused to apply the promissory estoppel doctrine due to the "contingent nature of [an] offer." *Neshaminy Constructors, Inc. v. Concrete Bldg. Sys., Inc.*, No. 06-1489, 2007 WL 2728870, at *16 (E.D. Pa. Sept. 18, 2007). Here, there were multiple contingencies included in the offer letter. *See supra* at pp. 2–3. Because the alleged promise was contingent, it was not actionable, as a matter or law, for promissory estoppel purposes. Accordingly, even if promissory estoppel theoretically applied to at-will employment offers, the Court would nonetheless grant the motion to dismiss the promissory estoppel claim and deny the motion requesting leave to amend the promissory estoppel claim.

The promissory estoppel claim fails as a matter of law. The motion to dismiss the promissory estoppel claim is granted, and the motion for leave to amend insofar is at relates to the promissory estoppel claim is denied with prejudice.

### 2. Dr. Chand's Negligent Misrepresentation Claim

A claim for negligent misrepresentation requires: "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and; (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." *Bortz v. Noon*, 729 A.2d 555, 561 (Pa. 1999). Merck makes two arguments in favor of dismissal of the negligent misrepresentation claim: first, the economic loss doctrine bars recovery for purely monetary damages, and second, Dr. Chand does not allege an actionable misrepresentation. Each argument fails for the reasons discussed below.

9

### A. Economic Loss Rule

Merck argues that as a general matter, Dr. Chand cannot state a claim for negligent misrepresentation because of the economic loss rule. "The economic loss rule is that tort law is not intended to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement. To recover in negligence there must be a showing of harm above and beyond disappointed expectations evolving solely from a prior agreement." *Gongloff Contracting, L.L.C. v. L. Robert Kimball & Assocs., Architects & Engineers, Inc.*, 119 A.3d 1070, 1074 (Pa. Super. 2015). The Supreme Court of Pennsylvania has adopted an exception to the economic loss rule for certain negligent misrepresentation claims, however, which is codified in Section 552 of the Restatement (Second) of Torts. *See generally Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270 (Pa. 2005).

> Section 552 states:
>
> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
>
> > (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
> >
> > (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
>
> (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Restatement (Second) of Torts § 552 (1977).

In *Bilt-Rite*, the Supreme Court of Pennsylvania applied Section 552 to a negligent misrepresentation action against an architect. *See* 855 A.2d at 282–88.

> [W]e hereby adopt Section 552 as the law in Pennsylvania in cases where information is negligently supplied by one in the business of supplying information, such as an architect or design professional, and where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of information.

*Id.* at 287.

The court concluded that this decision was consistent with its prior cases addressing tort duties for five reasons:

> ➢ First, although an architect or design professional may not have a contractual relationship with the contractor who ultimately suffers economic damages in reliance upon the professional's design, . . . the professional is well aware that the design will be provided to and utilized by others in their own business dealings.
>
> ➢ Second, on the question of the social utility of the conduct at issue, obviously design professional services play an important role in public and private planning. But, by the same token, given the important reliance placed upon such professional services, there is no reason to exempt such professionals from the tort consequences of a negligent failure to perform those services in a competent fashion.
>
> ➢ Third, given the limitations upon the Section 552 action which we have outlined above, this Court is satisfied that the tort more than adequately accounts for the nature of the risk the duty imposes and the foreseeability of the prospective harm.
>
> ➢ Fourth, the consequence of imposing such a duty upon design professionals is neither unreasonable nor unduly burdensome; it merely subjects them to the same sort of professional responsibility other professionals face.
>
> ➢ And finally, the Section 552 formulation of the tort will serve the overall public interest by discouraging negligence among design professionals, while not requiring any more of them than is required by the traditional reasonable man and foreseeability tort paradigm applicable to others.

*Id.*

Last year, the Supreme Court of Pennsylvania again addressed the scope of Section 552 in *Dittman v. UPMC*, 196 A.3d 1036 (Pa. 2018). In *Dittman*, the court rejected that *Bilt-Rite* "merely created a narrow exception to the otherwise broad economic loss doctrine," and clarified that "[t]he *Bilt-Rite* Court set forth the general approach to the economic loss doctrine[.]" *Id.* at 1054. Under *Bilt-Rite* and *Dittman*, Section 552 provides that "if [a] duty arises independently of any contractual duties between the parties, then a breach of that duty may support a tort action." *Id.* Thus, *Bilt-Rite* ought not be read as applying only to "design professionals."

Although Merck is correct that Pennsylvania courts have not yet applied Section 552 to facts directly analogous to those at-issue here, the considerations animating *Bilt-Rite* and *Dittman* support extending Section 552 to negligence misrepresentations made by human resources recruiters with whom a job applicant plaintiff is not in privity. Primary to the court's analysis in *Bilt-Rite* was the that "[t]he concept of duty in the tort setting can be intertwined with contractual notions of privity . . . where the task is to determine whether the relationship between the parties gives rise to a duty." 866 A.2d at 281. In other words, where privity of contract is absent, the presence of a duty creates a similar set of obligations on the party owing the duty. The Court's analysis today of whether Section 552 applies, therefore, must begin with the question of whether a human resources recruiter owes a duty to a prospective job applicant, without regard to the applicant's actual profession.

> The determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution.

*Id.* (quoting *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000)). Collectively, the duty factors support imposing a duty on Merck's human resources staff.

12

The relationship between Merck and Dr. Chand was clear: Merck and Dr. Chand were negotiating a potential employment arrangement, with the hope of eventually reaching an agreement that would have placed the parties in privity.

The utility of Merck's conduct is undeniable. There is significant value provided by human resources employees bringing in the best and brightest potential applicants, for Merck and certainly in STEM fields.

The risk—and the foreseeability of the risk—created by the interaction is obvious. In the national (and international) job market, thanks to internet job postings and the competitiveness of highly sought-after positions, applicants are often unimpeded by geographic limitations. Further, employment opportunities frequently present themselves quickly and require split-second decisions by applicants. Human resources employees unquestionably are aware of these facts.

The consequences of imposing a duty are relatively minor. Human resources employees simply need to ensure that they do not put the employment cart before the background check horse. Here, for example, although Merck's offer letter contained various conditions upon which the offer was contingent, Merck could have made clear that the ***extension*** of a job offer did not indicate that an applicant was prejudged for compliance with those conditions.

Finally, the utility of imposing a duty here is evinced by the situation at hand, as it would mitigate the risk of job applicants moving thousands of miles only to end up in a new environment without a new job.

*Bilt-Rite*'s more specific discussion of the scope of the duty owed under Section 552 similarly shows that imposing a duty on Merck is appropriate:

> Section 552 sets forth the parameters of a duty owed when one supplies information to others, for one's own pecuniary gain, where one intends or knows that the information will be used by others in the course of their own business activities. The tort is narrowly tailored, as it applies only to those businesses which provide

services and/or information that they know will be relied upon by third parties in their business endeavors, and it includes a foreseeability requirement, thereby reasonably restricting the class of potential plaintiffs.

*Id* at. 285–86. Here, Merck was supplying information for its own gain—it provided employment information in hopes of hiring a new employee—and it knew that applicants would have to rely on the information in deciding whether to take the position or not.

Following the paradigm set forth by the Supreme Court of Pennsylvania in *Bilt-Rite*, the Court determines that the exception to the economic loss rule articulated in Section 552 of the Restatement (Second) of Torts applies to representations made by human resources recruiters. As such, Dr. Chand's negligent misrepresentation claim against Merck is not futile as a matter of law, and she may endeavor to amend this claim.

### B. Whether the Complaint Alleges an Actionable Misrepresentation

Although the economic loss rule is not a bar to Dr. Chand's negligent misrepresentation claim, Dr. Chand must still allege the elements of negligent misrepresentation. In Dr. Chand's original Complaint, the allegations regarding misrepresentations were extremely vague. Dr. Chand's Amended Complaint is clearer but still not explicit in identifying the misrepresentations on which she relied. Merck argues that Dr. Chand still has not adequately alleged a misrepresentation. Dr. Chand responds that the Amended Complaint alleges Merck misrepresented to Dr. Chand that she was eligible to work for Merck. Dr. Chand appears to base this assertion on several specific paragraphs of the Amended Complaint:

> 12. Thereafter and on March 9, Ms. Sutcliffe contacted Dr. Chand and informed her she had been selected for the position and she would hear from Merck soon with an offer letter. Dr. Chand was elated and looked forward to returning to the Philadelphia area and working for Merck.
>
> . . .

14

15. Each member of the Merck operations team that interviewed Dr. Chand knew she was on an F-1 student visa and had moved to the United States for her post graduate degree.

37. However, Merck knew about Dr. Chand's visa status *before* it offered her a job and could have declined to offer her a job but instead offered her a job already knowing about her status.

38. Upon information and belief, Merck has a policy that prohibits hiring of holders of F-1 student visas, like Dr. Chand, at the level of scientist position Merck offered to Chand.

39. Notwithstanding its policy and knowledge of Dr. Chand's F-1 student visa status, Merck offered employment to Dr. Chand on March 16, and Chand accepted Merck's offer on March 21.

67. Merck knew Dr. Chand's visa status and knew its own policies prohibited hiring someone with Dr. Chand's visa status, but Merck offered her the position anyway.

68. On at least three occasions - March 9, 13 and 16, 2018 - Merck confirmed with Dr. Chand she was selected for the position at Merck and would be offered employment at Merck.

69. Merck's statements and representations about its policy regarding hiring someone with Dr. Chand's visa status were untrue and were misrepresentations of present facts and future occurrences that caused harm to Dr. Chand.

Amended Compl. ¶¶ 12, 15, 37–39, 67–69.

Taken together, these allegations at least arguably create an inference that Merck, by offering Dr. Chand a position while at the same time knowing that Dr. Chand had an F-1 visa, impliedly misrepresented to Dr. Chand that F-1 visa recipients were eligible for employment at Merck. Under Pennsylvania law, implied misrepresentations such as this are actionable. Indeed, in a recent case applying the *Bilt-Rite* exception to the economic loss rule, the Pennsylvania Superior Court held that implied misrepresentations can be actionable under Section 552 of the Restatement of Torts. *See Gongloff Contracting, L.L.C.*, 119 A.3d at 1079 (holding that "the trial

court's decision that Gongloff was required to identify an express representation [rather than an implied representation] . . . to succeed on its Section 522 claim was legally erroneous").

Because the economic loss rule does not bar Dr. Chand's claim for negligent misrepresentation, and because the Amended Complaint contains allegations sufficient to support an implied misrepresentation made by Merck, the Court grants the motion for leave to amend insofar as it relates to Dr. Chand's negligent misrepresentation claim.[5]

### 3. Dr. Chand's Amended Claims Premised on the Breach of an Implied Contract

Under Pennsylvania law, the elements of a cause of action for breach of contract are: (1) the existence of a contract, including its essential terms; (2) a breach of the duty imposed by the contract; and (3) damages resulting from the breach. *See McShea v. City of Philadelphia*, 995 A.2d 334, 340 (Pa. 2010). The Court need not discuss whether there was a breach of any contractual duty because no contract existed between these parties as a matter of law.

First, the alleged contract—the offer letter—included several contingencies upon which the offer rested, which Dr. Chand did not satisfy. *See supra* at pp. 2–3. Conditional job offers do not create enforceable contracts. *See Enigwe v. U.S. Airways/U.S. Airways Express*, 438 F. App'x. 80, 83 (3d Cir. 2011) (affirming dismissal of breach of contract claim, where employer was alleged to have terminated a conditional offer of employment to a job applicant who failed to pass a

---

[5] Although not discussed by Merck, injury resulting from justifiable reliance is a necessary element of negligent misrepresentation claims. *Bortz*, 729 A.2d at 561. It is not clear whether Dr. Chand will be able to establish that her reliance was justifiable, given that Merck's offer letter explicitly warned: "We advise you not to alter your current employment status until we advise you that the above contingencies have been successfully completed." Amended Compl., Ex. 2 (Offer Letter). Nonetheless, the Third Circuit Court of Appeals has "stress[ed], as have the Pennsylvania courts, that the issue of whether reliance on a representation is reasonable (or justifiable) is generally a question of fact that should be presented to the jury." *Tran v. Metro. Life Ins. Co.*, 408 F.3d 130, 139 (3d Cir. 2005) (collecting Pennsylvania state court cases). Consequently, this issue is not appropriate for resolution at this stage of the litigation.

background check, because the employee was hired "contingent upon a favorable background investigation" and "without a favorable background check, he did not have an offer of employment").

Second, the offer letter explicitly stated that "[n]othing herein shall be construed as creating a contractual relationship between you and Merck." Amended Compl., Ex. 2 (Offer Letter). An offer letter that expressly evinces a lack of mutual assent between the parties is not an enforceable contract. Instead, such an offer letter is "part of the hiring process, and [i]s not the employment contract." *Pulse Techs., Inc. v. Notaro*, 67 A.3d 778, 780 (Pa. 2013). As courts throughout this District and the Commonwealth have held, the "disclaimer of the formation of a contract nullifies [a] plaintiff's claim for breach of contract." *Landmesser v. United Air Lines, Inc.*, 102 F. Supp. 2d 273, 280 (E.D. Pa. 2000) (collecting cases); *see also Ruzicki v. Catholic Cemeteries Ass'n of Diocese of Pittsburgh*, 610 A.2d 495, 496 (Pa. Super. 1992) (rejecting that employment handbook created a contract because handbook stated it "was not intended to give rise to any contractual obligations"); *Rutherfoord v. Presbyterian-Univ. Hosp.*, 612 A.2d 500, 504 (Pa. Super. 1992) (holding that employee handbook containing "'disclaimer' language . . . including [that certain rights in the handbook] are not intended to constitute a contract, . . . cannot be found to create an implied contract of employment"); *Philmar Mid-Atl., Inc. v. York St. Assocs. II*, 566 A.2d 1253, 1254 (Pa. Super. 1989) (dismissing complaint for failure to allege actionable contract where letter of intent did not "disclose any agreement, or even an agreement to negotiate" because it included language stating that it was "non-binding on the parties").

Merck's offer letter to Dr. Chand was not an enforceable contract, and so Dr. Chand's claims for breach of implied employment contract and breach of contract premised on the covenant of good faith and fair dealing fail as a matter of law. Dr. Chand's claim in her initial complaint

17

premised on standalone breach of the covenant of good faith and fair dealing also fails as a matter of law.[6] Merck's motion to dismiss the original Complaint's claim for breach of covenant of good faith and fair dealing is granted. Dr. Chand's motion for leave to amend her complaint insofar as it proposes to add two claims for breach of implied contract is denied with prejudice.

## CONCLUSION

As set forth above, the motion to dismiss the complaint is granted and the original Complaint is dismissed. The motion for leave to amend the complaint is granted insofar as it relates to the claim for negligent misrepresentation; otherwise leave to amend is denied with prejudice. An appropriate order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[6] "'[A] claim for breach of the implied covenant of good faith and fair dealing is a breach of contract action, not an independent action for breach of a duty of good faith and fair dealing.'" *Cummings v. Allstate Ins. Co.*, 832 F. Supp. 2d 469, 473 (E.D. Pa. 2011) (citing *LSI Title Agency, Inc. v. Evaluation Servs., Inc.*, 951 A.2d 384 (Pa. Super. 2008)). The initial complaint did not allege the existence of an underlying contract. This claim fails as a matter of law. *See Long v. Valley Forge Military Acad. Found.*, No. 05-4454, 2008 WL 5157508, at *9 (E.D. Pa. Dec. 8, 2008) ("Plaintiff does not state a claim for breach of the duty of good faith and fair dealing because Plaintiff has not grounded this claim on an enforceable contract."); *see also Sheinman Provisions, Inc. v. Nat'l Deli, LLC*, No. 08-0453, 2008 WL 2758029, at *3 (E.D. Pa. July 15, 2008) ("In order to plead a cause of action for breach of the covenant of good faith, whether it is an express or implied covenant, a plaintiff must properly plead the elements of a claim of breach of contract.").