# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SASWATI N. CHAND,** | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **MERCK & CO., INC.,** | : | **No. 19-0286** |
| *Defendants* | : | |

## MEMORANDUM

PRATTER, J.                                                                                          APRIL 24, 2020

Conditional offers of employment are fraught with potential problems. Certainly, this case is a prime example. It arises from a conditional offer of employment from Merck[1] to Dr. Saswati Chand. When the offer was rescinded, Dr. Chand brought suit. In a prior ruling, the Court dismissed all of Dr. Chand's claims with prejudice, with the exception of the negligent misrepresentation claim as to which Dr. Chand received leave to amend. *See* Memorandum of July 26, 2019 (Doc. No. 22).

Now, Merck seeks summary judgment on that remaining claim, asserting that Dr. Chand has failed to marshal sufficient evidence for the claim to proceed to a jury. For the reasons set forth below, the Court must deny the motion.

### BACKGROUND[2]

Dr. Chand is an Indian foreign national, who at the time of applying to Merck for the position of Global Medical Information Specialist ("GMIS"), held an F-1 student visa. Dr. Chand

---

[1]     Defendants assert that the offer letter came from Merck Sharp & Dohme Corp., which is a wholly-owned subsidiary of Merck & Co., Inc. Hereinafter, the Court refers to both entities as "Merck" and "Defendant."

[2]     Unless noted, the following facts are undisputed. All facts are construed in the light most favorable to Dr. Chand, the non-movant.

also received a Ph.D. from Thomas Jefferson University in biochemistry and molecular pharmacology, which is a science, technology, engineering and math, or "STEM" degree.

F-1 student visas are temporary. With her F-1 visa status and STEM degree, Dr. Chand applied to receive an optional practical training ("OPT") employment authorization. An OPT work authorization for an F-1 visa holder is approved after endorsement from an educational institution. Prior to graduating from Thomas Jefferson University, Dr. Chand applied for and was approved for an OPT extension for her F-1 visa, and through it she received an employment authorization card permitting her to work in the United States until May 2018. She believed this extension would permit her work authorization until May 2020, after further extension of her OPT, and that such an extension did not require additional sponsorship, so long as she continued to work in the STEM field and had an employer that uses "E-Verify." She also believed she would be authorized to work through 2020 because she planned to marry her then boyfriend at the time, a U.S. citizen. They married each other in May 2019.

Dr. Chand submitted a job application to Merck in December 2017. In early 2018, Dr. Chand began interviewing with Merck for the GMIS position. In Dr. Chand's application to Merck, she indicated she would not require employer sponsorship from Merck. While Merck contends that Dr. Chand did not inform any Merck interviewer that the company would need to be involved in assisting her with obtaining a STEM OPT extension, in an email from Heather Sutcliffe to other interviewers, Ms. Sutcliffe informed these individuals that Dr. Chand was on a student visa until May 2020. Dr. Chand further testified that she told Ms. Sutcliffe that her student visa was due for an extension, she was on an F-1 visa, she had started her OPT in May 2017, and she could work on an OPT or STEM OPT until May 2020.

The parties dispute which form version of the Merck job application Dr. Chand completed. On both versions offered to the Court, a question related to sponsorship asks: "If you are a foreign national, will you now or in the future require sponsorship for employment visa status?" Pl.'s Opp'n, Ex. 5. In response, Dr. Chand noted "no." Merck asserts Dr. Chand filled out a version of the application where the response contained additional information, such that a "no" response also represented that an applicant further certified: "I hold a visa status that provides work authorization and will never require sponsorship." Pl.'s Opp'n, Ex. 7 at Merck 50. Dr. Chand contends there was no such additional language after the option to select "no" on the submission she made.

Prior to applying for the Merck position, Dr. Chand reviewed the job posting, which informed applicants that visa sponsorship was not available for the position. Dr. Chand understood, at the time that she submitted her job application, that she would not be eligible for the GMIS position if she required sponsorship. Heather Waslin, Merck's Senior Talent Acquisition Advisor, further testified that if Dr. Chand had stated she was on a visa throughout the application process, she would not be eligible for the position. Pl.'s Opp'n, Ex. 4 at 104. Although disputed by Dr. Chand, Merck asserts it does not have an overarching policy regarding hiring of student visa holders; rather, the availability of visa sponsorship is determined on a candidate-by-candidate basis. Furthermore, Nancy Barnett, a paralegal employed by Merck and who reviewed Dr. Chand's candidacy, stated in an email exchange with Ms. Waslin, "someone who has an [employment authorization] card and/or needs to file for a STEM extension is an F-1 temporary student visa [holder] and will require either an H-1B or O-1 visa before the expiration of the F-1 status." Pl.'s Opp'n, Ex. 8 at Merck 514.

Prior to any face-to-face interviews with Merck, Crown Bioscience offered Dr. Chand a position as a study director in San Diego, California. Dr. Chand accepted the offer in January 2018. Dr. Chand was to begin her employment with Crown Bioscience the next month. She moved to San Diego on February 5, 2018. During her employment with Crown Bioscience, she and her employer worked on a STEM OPT extension application, but the application was not submitted due to Dr. Chand's resignation from Crown Bioscience.

While employed with Crown Bioscience, Dr. Chand sent follow-up emails to Merck to inquire into her status as an applicant. She wrote to Ms. Sutcliffe in February 2018, representing that she had another offer from a different company and was required to move out of her current residence in a month. She omitted any reference to the fact that she had already accepted a full-time position and had moved to San Diego. The next month, Dr. Chand exchanged emails with Maya Isaac, one of Dr. Chand's interviewers, and the hiring manager for Dr. Chand's application, and informed Ms. Isaac that she had not accepted any other position and continued to remain interested in a position at Merck.

Merck offered Dr. Chand the GMIS position on March 14, 2018. Prior to making the formal offer, Ms. Sutcliffe had transmitted materials in her possession related to the recruitment and hiring of Dr. Chand to Ms. Waslin, because Ms. Sutcliffe was leaving Merck for another position, and Ms. Waslin took on the responsibilities related to Dr. Chand's application.

The offer letter contained a number of conditions. The offer was contingent upon Dr. Chand's successful completion of a preplacement drug screen and satisfactory verification of employment history, education, and background check results. Dr. Chand was required to sign the Terms & Conditions of Employment document on her first day, and the offer was for an "at-will" position. The offer letter specifically explained that Merck could terminate Dr. Chand's

4

prospective employment at any time, with or without cause or notice, and that nothing in the letter "shall be construed as creating a contractual relationship between [Dr. Chand] and Merck." Offer Letter, Def.'s Mot. for Summary Judgment, Ex. 12, p. 2. The offer letter further cautioned: "We advise you not to alter your current employment status until we advise you that the above contingencies have been successfully completed[,]" and also informed Dr. Chand that the offer was contingent upon proof of identify and eligibility to work in the United States. Offer Letter, Def.'s Mot. for Summary Judgment, Ex. 12, p. 2. The letter provided: "[Y]our current employer verification (if applicable) will take place after all other pre-employment contingencies clear and you have tendered your resignation from your current employer." Offer Letter, Def.'s Mot. for Summary Judgment, Ex. 12, p. 2.

Dr. Chand admits that Merck, by way of its employees or otherwise, never affirmatively told her that she had met all of the pre-requisites for employment. However, in an email dated April 4, 2018, Dr. Chand inquired into whether there was any other information Merck needed to effectuate the onboarding process. In response, a member of Merck's recruiting team, Pamella Palmer, represented "I have everything I need. A member of the new hire onboarding team will be reaching out to you within the next couple of days." Pl.'s Opp'n, Ex. 3 at Merck 102.

Prior to receiving the written offer, Dr. Chand spoke with Ms. Sutcliffe on the phone, and at that time, Ms. Sutcliffe told Dr. Chand that Merck was working on an offer for Dr. Chand. During that conversation, Dr. Chand informed Ms. Sutcliffe that she had moved to San Diego and had begun working at Crown Bioscience. According to the testimony of Dr. Chand, Ms. Sutcliffe reassured her that those circumstances would not be a problem, and that Merck would "start the process[.]" Chand Dep., Pl.'s Opp'n, Ex. 2 at 106:8-16. Furthermore, according to Dr. Chand, at some point in time, when discussing the offer letter, she informed Ms. Sutcliffe that she would

5

give her notice of resignation to Crown Bioscience. After Dr. Chand also represented to Ms. Sutcliffe that she did not believe she would have a problem with any background checks, Ms. Sutcliffe responded that Dr. Chand "should be okay." Chand Dep., Pl.'s Opp'n, Ex. 2 at 117:24-118:13. Dr. Chand gave her notice of resignation to Crown Bioscience prior to accepting Merck's offer letter. Dr. Chand returned her signed offer letter on March 21, 2018, and made plans to return to the Philadelphia area. She signed a lease for an apartment on March 23, 2018.

Dr. Chand emailed Ms. Waslin a week after transmitting her signed offer letter to inquire about the status of her job application, acknowledging that a start date had not yet been finalized. In that email, she stated: "I just wanted to check in that I covered everything that I need to do from my end. Since I am on an F1 visa, working under an OPT, I will soon need to get a STEM extension on my OPT to be able to work for the next two years. To be able to file for an extension, Merck needs to be an E-Verify employer, please confirm. If it already isn't, it is a short quick process and you can find more information here . . . ." Def's Mot. for Summary Judgment, Ex. 13.

After having received this email, Ms. Waslin consulted her manager, Merck's compliance department, and Merck's immigration paralegal, Ms. Barnett. After these individuals concluded amongst themselves that Dr. Chand inaccurately represented her status on her initial job application, Merck revoked its employment offer. According to Ms. Sutcliffe and Ms. Waslin, had Dr. Chand answered the appropriate prescreening question informing Merck that she held a temporary visa, she would not have been selected for an interview. Dr. Chand was notified of the revocation in April 2018. In a follow-up email to Dr. Chand, Ms. Waslin further explained: "In response to the prescreening question: *If you are a foreign national, will you now or in the future require sponsorship for employment visa status?* [Y]ou answered 'no[.]' A person working on a

6

F-1 visa will require future sponsorship once the visa expires. Hiring anyone on this type of visa is not an option that Merck can provide for this position. Had the information you provided in the prescreening question been accurate, you would not have been considered for the position." Pl.'s Opp'n, Ex. 26 at Merck 455.

Following rescission of Merck's employment offer, Dr. Chand found alternative work as a post-doctorate fellow at Thomas Jefferson University, a position that paid a lower salary than her position at Crown Bioscience and that would have been paid by Merck.

### LEGAL STANDARD

A court can grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact finder could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248). Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's

7

initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." FED. R. CIV. P. 56(c). "Merely because a non-moving party is proceeding pro se does not relieve him of the obligation under Rule 56(e) to produce evidence that raises a genuine issue of material fact." *Dawson v. Cook*, 238 F. Supp. 3d 712, 717 (E.D. Pa. 2017) (quoting *Boykins v. Lucent Techs., Inc.,* 78 F. Supp. 2d 402, 408 (E.D. Pa. 2000)). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

## DISCUSSION

The sole remaining claim here, negligent misrepresentation, is based, at its core, on the theory that Merck made misrepresentations, implied or otherwise, as to Dr. Chand's eligibility for hire despite her temporary visa status. A claim for negligent misrepresentation requires proof of: "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and, (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." *Bortz v. Noon,* 729 A.2d 555, 561 (Pa. 1999).

8

According to Merck, its offer letter was contingent upon Dr. Chand meeting all prerequisite conditions of employment, one of which required she not be a temporary visa holder who required sponsorship. Because Dr. Chand could not meet this prerequisite, and actually had completed her application inaccurately, Merck asserts it had every right to rescind its conditional offer, and Dr. Chand cannot meet any of the elements of a negligent misrepresentation claim. Additionally, Merck asks the Court to reevaluate its prior ruling that there was a duty on the part of Merck under the circumstances of this case.

Dr. Chand opposes Merck's latest efforts.

## I. Whether Dr. Chand can sufficiently demonstrate a material misrepresentation was made.

A promise or representation made by an employer regarding future conduct is not generally actionable. *See Cathcart v. Micale*, 402 F. Supp. 3d 110, 116 (E.D. Pa. 2019). However, courts have refused summary judgment when the representation is made based on some kind of specialized knowledge or present fact.

Although neither party cited it to the Court, *Browne v. Maxfield*, 663 F. Supp. 1193 (E.D. Pa. 1987) is particularly instructive for its factual similarities to the case at hand. In *Browne*, the plaintiff worked in Washington, D.C. and was recruited for a position as news director for KYW in Philadelphia. He had phone conversations and meetings with a recruiting consultant, as well as several employees at KYW. Specifically, during one meeting, attended by a recruiter and the vice president of the television station, among others, plaintiff received positive feedback. Understanding that the final decision to offer him a job had not yet been made, he testified he was told by the KYW vice president to travel to New York to "finalize the deal" with both the vice president and the president of the television station group. During the same conversation, the plaintiff asked if he should tell his current employer he would be formally resigning, to which the

9

vice president affirmed, and stated "OK. do it." *Id.* at 1197. The same day, the plaintiff reached out to his current supervisor and informed him of his pending formal resignation. Despite perceived notions otherwise, the plaintiff emerged from the meeting in New York without a job. Furthermore, while being able to maintain his then current employment in Washington, D.C. initially, after a disagreement with his supervisor, the plaintiff was fired. *Id.* at 1197-98.

The court held there was a genuine dispute as to whether a material misrepresentation was made, noting that while the vice president of KYW's instruction to tell the applicant's current employer he would be resigning would not be actionable if it "were merely a prediction that Browne would get the job[,]" or an assertion of the defendant's intentions to hire the plaintiff, the assertion would be actionable if the agent of KYW "purport[ed] to have special knowledge of facts which would justify the expectations he [was] raising, or if [his] statement was a statement of present fact." *Id.* at 1203. Finding that the "assent" to the plaintiff's telephone call to his current supervisor could be either a statement of present fact or a statement made with special knowledge, namely that the president would not veto the decision to make an offer, the court held there to be sufficient evidence of a material misrepresentation as to the status of the plaintiff's candidacy for the position of news director. *Id.* at 1203.

Dr. Chand's situation is analogous. As previously noted, Pennsylvania law holds that implied misrepresentations are actionable under a theory of negligent misrepresentation. Memorandum of July 26, 2019, p. 15. The following circumstances could give rise to the inference that Merck, by offering Dr. Chand the GMIS position, while knowing that she held an F-1 visa, constituted an implied material misrepresentation as to her eligibility for the position:

1) During an early interview with Ms. Sutcliffe, Dr. Chand informed Ms. Sutcliffe of her F-1 visa status and that she would require an OPT extension. Ms. Sutcliffe further transmitted to other interviewers that Dr. Chand held a student visa that would expire in 2020.

2) At some point, Ms. Sutcliffe and Dr. Chand spoke, and Dr. Chand said she would be resigning from her current employment, to which Ms. Sutcliffe did not raise a challenge. Furthermore, when Dr. Chand represented that she believed there should not be any issues with her background checks, Ms. Sutcliffe responded that Dr. Chand "should be okay."

3) After having received her offer letter, in April 2018, Dr. Chand inquired by way of email into whether Merck needed any additional information to effectuate the onboarding process. In response, Ms. Palmer, a member of Merck's recruiting team, stated that she had everything she needed.

Presented with these facts, a reasonable factfinder could determine that representatives of Merck impliedly communicated that Dr. Chand was eligible for the GMIS position despite being an F-1 visa recipient.

The Court also notes that the parties spend much effort disputing whether Dr. Chand can ultimately prove whether Merck has a "policy" related to the hiring of temporary visa holders. For instance, Merck argues that there is no evidence that it mispresented to Dr. Chand a supposed policy with respect to hiring student visa holders for the GMIS position, and further contends that Dr. Chand cannot point to any evidence of such a policy. That a "policy" or "practice" exists may be relevant to proving a misrepresentation, but it is not dispositive of the issue at this time. Indeed, Dr. Chand has not pointed to any proof of a formal written policy of such a hiring practice. However, again, the dispute is off-point. The critical issue is the import of the extension of an offer, and its surrounding communications or omissions by Merck, despite the purported knowledge of Dr. Chand's temporary visa status.[3] Consequently, the Court finds that Dr. Chand has raised the requisite factual dispute on the first prong of her tort claim.[4]

[3]     For these reasons, the Court also declines to address the parties' dispute as to the propriety of Dr. Chand's allegedly new theory of another policy. Purportedly, that policy relates to Merck's internal requirement that its immigration department review any applications where the applicant is a temporary visa holder.

[4]     To the extent that Merck seeks to shift blame to Dr. Chand and contends that it cannot be held liable when it was Dr. Chand who misrepresented her employment eligibility on her application, the argument further misses the mark. Dr. Chand has testified that at the time of completing her application, she did not believe she required sponsorship, and completed the application accordingly. To the extent that Merck may

**II.     Whether Merck ought to have known about the falsity of any alleged misrepresentations.**

According to Merck, Dr. Chand must prove that it failed to make reasonable investigation of the truth of its alleged representations regarding the ability to hire Dr. Chand. It contests that there is no dispute that Merck only offered Dr. Chand prospective employment due to her inaccurate application. Thus, Merck claims there was no reason to doubt or investigate the truth of Dr. Chand's assertions.

As set forth by the Pennsylvania Supreme Court, to prove negligent misrepresentation, "the speaker need not know his or her words are untrue, but must have failed to make reasonable investigation of the truth of those words." *Gibbs v. Ernst*, 538 Pa. 193, 210, 647 A.2d 882, 890 (1994).

Under the facts presented, a reasonable factfinder could determine that Merck failed to engage in the requisite reasonable diligence, such that Merck ought to have known of the falsity of its misrepresentation. Again, Dr. Chand has pointed to record proof that Ms. Sutcliffe and perhaps several of her other interviewers were aware that she held a student visa. Dr. Chand also points to evidence that Ms. Sutcliffe knew of Dr. Chand's need for further extension of her student visa. Ms. Sutcliffe communicated that Dr. Chand's application "should be okay," and further, did not raise any objections to the information that Dr. Chand would be giving her notice of resignation to Crown Bioscience. One would expect that all employees involved in a candidate's recruiting

---

seek to undermine her credibility or the import of her marking on the application form that she did not require sponsorship, Merck may do so at trial. Moreover, Dr. Chand has pointed to evidence that prior to receiving the offer letter, she informed at least one Merck interviewer that she was an F-1 visa holder. This fact alone is sufficient to raise the requisite dispute as to whether Merck perpetuated an implied misrepresentation as to Dr. Chand's employment eligibility throughout the application process, including after the offer was made. Even if Dr. Chand incorrectly completed her application, which the Court does not so find at this time, such "fault" does not diminish the assertions made, or lack thereof, on the part of Merck and/or its employees. Its role, if any, remains for the jury to consider.

12

process at a company such as Merck where many international professionals are hired ought to be aware of its employer's stance related to the availability of a position vis-à-visa student visa holders. A jury could find Merck failed to make reasonable investigation when its recruiting team became aware of Dr. Chand's visa status. Thus, the Court will not grant summary judgment on the second element of Dr. Chand's claim.

**III.    Whether Merck intended to induce Dr. Chand to alter her employment status.**

The Court also finds Dr. Chand has raised the necessary factual dispute on the third prong of the negligent misrepresentation claim.

Merck asserts that because its offer letter advised Dr. Chand not to change her employment status with Crown Bioscience until she was further advised that she met all contingencies of employment, and the letter further explained nothing in the letter was to be construed as creating a contractual relationship between the parties, Merck did not possess the requisite scienter to induce Dr. Chand's action. Merck also contends its discussions were related to future contingent events which cannot, as a matter of law, form the basis of a negligence claim.

However, Dr. Chand has pointed to evidence that could rebut Merck's contentions in this regard. A factfinder could find that Ms. Sutcliffe assented to Dr. Chand's notice of resignation, and furthermore, that both Ms. Palmer and Ms. Sutcliffe reassured Dr. Chand that her candidacy was pre-approved, with respect to her work eligibility, at the time the offer letter was extended. For these reasons, the Court finds such assertions by or on behalf of Merck were not made, as a matter of law, only with respect to future events. Whether Merck possessed the requisite intent to induce Dr. Chand to resign from her job at Crown Bioscience is a fact determination that belongs to a jury.[5]

---

[5]     Furthermore, Dr. Chand has pointed to the offer letter itself requiring her to complete her resignation, which she asserts could be interpreted in such a way as to deduce that she must actually resign

**IV.    Whether Dr. Chand's reliance on the alleged misrepresentation(s) was justified.**

Merck contends nothing in the record supports an inference that Dr. Chand justifiably relied on Merck's alleged misrepresentations. As a matter of law, according to Merck, Dr. Chand's claim fails because in an at-will employment relationship, an employee cannot justifiably rely on an employer's promise. Merck further contends that the offer letter itself cautioning Dr. Chand not to alter her current employment status, and her resignation prior to accepting her offer letter, demonstrate that any reliance on the part of Dr. Chand was not justified.

As an initial matter, the Court is not persuaded by the cases cited by Merck. Merck cites three cases in support of the argument that as a matter of law, there can be no finding of justifiable reliance in at-will employment relationships. Defs.' Mot. for Summary Judgment, pp. 17-18; Def.'s Reply Br., pp. 6-7. Merck also cites *Burton Imaging Grp. v. Toys "R" Us, Inc.*, 502 F. Supp.2d 434 (E.D. Pa. 2007) for the proposition that Dr. Chand's reliance is one-sided, and any one-sided reliance cannot raise an inference of justified reliance.

It is an overstatement to find that in at-will employment relationships, under all circumstances, an employer's "promise" is not actionable. In *Browne v. Maxfield*, discussed above, the defendants made the same argument, contending it was unreasonable for the plaintiff to quit a job, or take any other action leading to some pecuniary loss, in reliance on a promise or representation about an at-will employment relationship. Acknowledging the "logical force" of the argument, the court reasoned that should defendants prevail, "parties who negotiate terminable at[-]will employment contracts [would remain] unprotected by prohibitions against tortious conduct in business dealings, doctrines traditionally used 'to protect the reasonable expectations of the party who relies on another's course of conduct to the former's detriment in

---

to finalize her onboarding process. The consequence of this representation is not for the Court's determination today.

order to insure fundamentally fair dealing.'" *Browne*, *supra*, at 1203. The court also noted, "[t]o reject this conclusion is not, as defendants argue, to permit an end run around the terminable at will doctrine. It is merely to hold that a party negotiating a terminable at-will employment contract has a right to assess the risks inherent in such employment free of the distortions of tortious conduct." *Id.* This Court finds the *Browne* reasoning persuasive, and adopts it for this case. Even Merck concedes that "Pennsylvania courts generally require resolution of justifiable reliance by a jury[.]" Def.'s Reply Br., p. 6.

To that point, a factfinder, presented with these facts, could determine that Dr. Chand's reliance was reasonable (and not merely one-sided). The formal offer letter cannot be considered in isolation. Indeed, prior to the transmittal of the formal offer, the record reflects Ms. Sutcliffe became aware of Dr. Chand's temporary visa status, and that Dr. Chand informed Ms. Sutcliffe she was in need of an OPT extension. Ms. Sutcliffe shared Dr. Chand's student visa status with her colleagues. Additionally, when Dr. Chand informed Ms. Sutcliffe of her plans to resign, and also explained that she believed there would be no issues with her application, Ms. Sutcliffe responded in a manner that may have telegraphed that Dr. Chand's application posed no problems. Indeed, after having received the formal offer, Dr. Chand again wrote to Merck's recruiting department to inquire into the status of her offer, asking if the company needed anything else, to which a recruiter responded that she had everything she needed.

These facts are akin to those present in *Browne*, and could give rise to the inference that Dr. Chand's eligibility was confirmed, at the time the assertions were made, despite her temporary visa status. Just as in *Browne*, where the court held an inference of justifiable reliance could be made when, during the recruitment process, the KYW vice president led the plaintiff to believe he would get an offer, and further affirmed the plaintiff's decision to give his current employer notice

15

of his resignation, *supra,* at 1203, here, Dr. Chand has demonstrated there is a triable issue with respect to whether she justifiably relied on Merck's representations.

**V.     Whether any purported misrepresentation caused Dr. Chand's alleged injuries.**

As to the final element of the negligent misrepresentation claim, although Merck argues that Dr. Chand's claim also fails because there is no statement or omission on the part of Merck that caused her to quit her job at Crown Bioscience, for the reasons already discussed, the Court finds that a factfinder could conclude Dr. Chand's reliance on Merck's assent, assertions, and/or omissions caused her to resign. Furthermore, Merck's contentions sound more in requests for the Court to weigh the evidence, which is in the proper province of a jury.[6]

For all these reasons, the Court declines to dismiss the negligent misrepresentation claim.

**VI.    Reconsideration of the previous ruling as to whether a duty under the circumstances exists.**

Finally, the Court addresses Merck's request for the reconsideration of whether a duty under the circumstances exists. The basis of Merck's contention for reevaluation is the idea that the Court's finding of a duty rested on assumptions that "have now proven to be unsupported by the evidence." Def.'s Mot. for Summary Judgment, p. 19.

"Any action in negligence is premised on the existence of a duty owed by one party to another." *Gibbs,* 647 A.2d at 890. "The determination [of] whether to impose affirmative common-law duties as a predicate to civil liability is a matter of law[.]" *Charlie v. Erie Ins. Exch.,* 100 A.3d 244, 250 (Pa. Super. 2014) (citing *Seebold v. Prison Health Servs., Inc.,* 57 A.3d 1232, 1243 (Pa. 2012)). Consequently, to the extent Merck seeks the Court to weigh the evidence or

---

[6]     Merck asserts there is no dispute that Dr. Chand resigned before accepting Merck's conditional offer, that Dr. Chand instead desired to move back to Philadelphia, in part, to be closer to her significant other, the offer was not final at the time she resigned, and there was no guarantee that she would receive approval of her OPT extension. Consequently, Merck claims the only reasonable inference on these facts is that Dr. Chand's actions alone are the sole reason why she incurred her purported injuries.

make other factual determinations more properly made by a factfinder, the Court declines to do so.

In its prior ruling of July 2019, the Court, at length, analyzed the applicable law and assessed the factors relevant to determining whether a duty exists in this case. *See* Memorandum of July 26, 2019, pp. 10-14 ("The determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution.") In determining there to be a duty, the Court made the following findings as to each factor:

- "The relationship between Merck and Dr. Chand was clear: Merck and Dr. Chand were negotiating a potential employment arrangement, with the hope of eventually reaching an agreement that would have placed the parties in privity." *Id.* at 13.

- "The utility of Merck's conduct is undeniable. There is significant value provided by human resources employees bringing in the best and brightest potential applicants, for Merck and certainly in STEM fields." *Id.*

- "The risk—and the foreseeability of the risk—created by the interaction is obvious. In the national (and international) job market, thanks to internet job postings and the competitiveness of highly sought-after positions, applicants are often unimpeded by geographic limitations. Further, employment opportunities frequently present themselves quickly and require split-second decisions by applicants. Human resources employees unquestionably are aware of these facts." *Id.*

- "The consequences of imposing a duty are relatively minor. Human resources employees simply need to ensure that they do not put the employment cart before the background check horse. Here, for example, although Merck's offer letter contained various conditions upon which the offer was contingent, Merck could have made clear that the extension of a job offer did not indicate that an applicant was prejudged for compliance with those conditions." *Id.*

- "Finally, the utility of imposing a duty here is evinced by the situation at hand, as it would mitigate the risk of job applicants moving thousands of miles only to end up in a new environment without a new job." *Id.*

17

While Merck seeks to challenge the Court's determinations, its arguments remain unavailing. First, it argues with regard to the relationship between the parties, the Court did not consider the withdrawal of Dr. Chand's offer as based on her initial inaccurate answers to prescreening questions. It claims "[at that point, Merck and [Dr.] Chand were not negotiating a potential employment arrangement," but Dr. Chand was merely an applicant for an "open job," which clearly informed her that individuals requiring sponsorship could not be hired. Thus, "[t]here [was] no basis to conclude that Merck hoped to eventually reach an agreement at that nascent stage in the process." Def.'s Mot. for Summary Judgment, p. 19. The Court finds these assertions are vague and otherwise illogical. It was of no moment to the Court's decision at what point in time the potential employment relationship was formed. Merck cannot plausibly dispute that it engaged in recruitment efforts in an endeavor to form an employment relationship with Dr. Chand. Dr. Chand's arguable inaccurate application does not somehow absolve this potential relationship.

As to social utility, Merck, after conceding that there is social utility to the conduct of human resources recruiters, again seeks to blame Dr. Chand and argues that "there is also utility in requiring candidates to be honest and accurate in the first instance when applying for a job." *Id.* It further contends that "it should not be required to 'double check' that each and every prescreening question was, in fact, accurately answered when the candidate—and not Merck—is in the best position to answer such questions in the first instance." *Id.* However, the question of social utility does not inquire into the candidate's conduct, but rather the actor's, namely the human resource employee's. The Court rejects these arguments because they miss the mark.

As to the foreseeability factor, while Merck contends there was no basis to conclude that Dr. Chand would be making the split decision to leave another job, indeed there may be. Thus,

the foreseeability factor again weighs, as a matter of law, in favor of a finding of duty; indeed, such a duty exists to mitigate the consequences of false or careless representations on the part of employment recruiters.

As to the consequences factor, Merck argues that imposing a duty would require a duty to inquire and verify facts that are best known to the candidate. However, a finding of a duty in this case does not necessarily require a "verification duty" on the part of all employers standing in similar shoes. The duty found here arises when an employer is alleged to have been negligent in its assertions or omissions that may give rise to false impressions of a job applicant's eligibility for a position.

Finally, as to the last factor, Merck claims there is no utility in imposing a duty where the job applicant deliberately took action she was told not to.[7] Again, this argument fails because the Court's consideration is the utility to the public interest. In this case, the utility is high, even if a jury ultimately determines that Dr. Chand was not justified in resigning from Crown Bioscience.

---

[7]    The Court also rejects the position that Dr. Chand, by way of her summary judgment briefing, is attempting to amend her complaint by asserting that Merck "'represented to [Dr.] Chand that she was eligible and qualified to work for the company during her initial interviews on January 30, 2018, during her post-interview calls,' 'when Merck offered her a job,' and in post-offer communications." Def.'s Reply Br., p. 2, citing Pl.'s Opp'n, p. 29. These arguments fall under the theory if an implied misrepresentation that the Court has already identified.

### CONCLUSION

The present dispute offers another opportunity to examine the fine line between conduct, or the lack thereof, on the part of a potential tortfeasor, that is actionable, or not, when a plaintiff relies on that conduct to her detriment. The case is emblematic of an occasion where reasonable minds can disagree, and such is a case best left for the determination of a jury. The offer letter, and all of the circumstances surrounding that offer letter, cannot be said to constitute a definitive, mere "hunch" that Dr. Chand would engage in unfortunate action leading to her pecuniary loss. Consequently, the Court denies summary judgment. An appropriate order follows.

BY THE COURT:

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**